## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **DEBRA J. BRENT,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. JKB-22-1349** |
| **DUNCAN CRAMER, *et al.*,** | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

Before the Court are the Parties' cross motions for summary judgment (ECF Nos. 52, 54) and Plaintiff Debra J. Brent's Motion for Leave to File Third Amended Complaint (ECF No. 58). For the reasons stated herein, Brent's Motions (ECF Nos. 54, 58) will be denied, and Defendants Duncan Cramer and Joshua Roberts' Motion for Summary Judgment (ECF No. 52) will be granted. Judgment will be entered in favor of Defendants and the case will be closed. A separate order will issue.

## I.    BACKGROUND[1]

For years, Brent has been in a feud with her neighbors, Robert Parks, Van and Cynthia Gaus, and Jennifer and Brandon Cooper. (*See* ECF No. 54-13 at 2.) Brent is a Black woman, while her neighbors on Yale Street in Cumberland, Maryland are all white. (ECF No. 54 at 3.) Since 2019, Brent and her neighbors have regularly called the police to Yale Street over disputes

---

[1] When assessing a summary judgment motion, the Court views all facts and draws all reasonable inferences in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The background is recounted with that principle in mind, and because the gravamen of this Memorandum will focus on the Defendants' Motion for Summary Judgment, the Court has viewed all facts and drawn all reasonable inferences in the light most favorable to Brent.

and grievances of varying severity. Brent has repeatedly called to voice her concerns about fires in the area and to say that her neighbors are spraying irritants at her or lighting smokey fires to annoy her. (*See* ECF Nos. 52-7 at 7–9; 55-1 at 10–14, 18; 56-12 at 3; 56-16 at 3; 52-10 at 3, 6, 10–11, 56-18 at 3.) The neighbors have repeatedly called to complain about Brent disturbing them by honking her car horn or activating her car alarm. (*See* ECF No. 52-7 at 8–9.) Cooper has accused Brent of harassing him over where he parks his car and Brent has accused Cooper of running over her bushes while yelling and wearing a confederate flag. (*Id.* at 4.) Many of Brent's calls (and many of the neighbors' calls) have been about non-emergencies, such as a light being shined into Brent's house or a stray cat. (*See* ECF No. 55-1 at 14.) Brent concedes, for example, that the cat incident was a non-emergency, she admits that she called about the cat to retaliate against Cooper, its owner, who had recently told her that she should be "taken into the woods and strung up." (*Id.*)

Parks in particular has been harassing Brent for years. (ECF No. 54-8.) Brent says that in 2019 Parks called the police and lied about her mental health, leading the police to conduct a wellness check and consider involuntary commitment. (*See* ECF Nos. 52-10 at 10, 54-8 at 6.) Parks has yelled at Brent and called her racist and sexist names over minor transgressions, prompting Brent to call the police and suggest that Parks is a threat to her life. (*See* ECF Nos. 54-2 at 3; 56-14 at 3.) Indeed, Parks admitted to police officers that he has yelled at Brent and called her a racial slur. (*See id.*) Parks regularly plays metal music and sings along loudly and in an intimidating voice specifically to disturb or frighten Brent. (ECF Nos. 54-2 at 9–10; 52-10 at 2–3.) Brent has also accused Parks of driving his lawn mower in front of her car in the street in a

2

threatening way.  (ECF Nos. 52-10 at 8; 55-1 at 13.)[2]

From 2019 to 2021, various members of the Cumberland Police Department, including the Defendants, have responded to these calls, recorded the statements of the individuals involved, and advised them of their rights to file charges.  Officers have admonished both Brent and Parks.  (*See* ECF Nos. 52-10 at 2; 52-7 at 6.)  They have told Parks to turn down his music and to avoid racial slurs.  (*See* ECF No. 54-2 at 6–10.)  They have told Brent not to call 911 except in case of an emergency.  (*See, e.g.*, ECF No. 56-11.)  Based on the information before the Court, prior to the summer of 2021, neither Brent nor any of her neighbors had been charged with a crime in connection with the neighborhood feud.

The situation came to a head on June 20, 2021.  Around 7:42 p.m. that evening, Parks called the police to complain about Brent recording him whenever he let his dogs out, turning her car around in his driveway, throwing trash in his yard, and cursing at him.  (ECF No. 54-3 at 3.)  Cumberland Police Department officers Cramer and Roberts responded to the scene.  (*Id.*)  While speaking with Cramer, Brent attempted to show him video evidence of Parks calling her racist and sexist names, exposing himself, and playing loud "demonic" music.  (ECF No. 52-6 at 43:15–58:21.)  Brent recalls that Cramer commented that he recognized the music as by the band Slipknot and liked it.  (*Id.* at 46:10–21.)  Cramer was then waved over by Van and Cynthia Gaus, with whom he had a friendly, personal conversation before he and Roberts left Yale Street.  (ECF No. 54-3 at 4–5.)

Brent then called 911 at 8:11 p.m. and again at 8:17 p.m. to ask for a more professional officer to come to assist her.  (ECF Nos. 54 at 5; 54-3 at 5.)  At 10:13 p.m., Brent called 911 again

---

[2] On January 4, 2022, Brent filed charges against Parks, detailing years of harassment.  (ECF No. 54-8.)  However, most of these incidents were either (1) not reported to the police until these charges were filed or (2) occurred after Cramer had already filed charges against Brent.  (*Id.*)  Neither Party submitted an affidavit from Parks.

3

to report a stray cat on her porch. (ECF No. 54-3 at 5.) At 10:31 p.m., a neighbor called the police to complain that Brent was using her car horn to disturb the neighborhood. (*Id.* at 6.) Cramer returned to the scene and heard Brent's car beeping as she locked and unlocked it remotely; Brent admits to doing this once or twice, but she denies doing so five or more times. (*See* ECF Nos. 54-3 at 5; 52-6 at 74:1–14.) At 10:48 p.m., Brent called 911 again and was transferred to Cramer, who told her not to call again except for an emergency. (ECF No. 54-3 at 7.) At 4:06 a.m. Brent called 911 again and was transferred to Cramer. (*Id.*) Over the course of the phone calls, Brent communicated to the Cumberland police that she was extremely dissatisfied with Cramer and Roberts' behavior. (*See id.*)

In the aftermath of the evening of June 20, 2021, Corporal Jenkins visited Brent in her home to address her complaints about the way that Cramer and Roberts handled the events of June 20, 2021. (*See* ECF No. 54-13 at 2.) While Jenkins was there, Cramer was putting together a charging document to charge Brent in relation to her alleged misuse of the 911 system and harassment of her neighbors. (*See id* at 3.) On June 24, 2021, Brent went to the City of Cumberland Police Department to file a personnel complaint about Cramer and Roberts, alleging that they admonished her for calling the police when she needed help and laughed at her with her racist neighbors. (*See* ECF No. 52-9 at 2–3.) In the early morning hours of June 25, 2021, Brent called 911 twice and was, again, advised not to call regarding non-emergencies. (ECF No. 52-7 at 7.) At 6:00 a.m. on that same day, June 25, Cramer filed the criminal complaint against Brent, charging her with harassment for "maliciously engag[ing] in a course of conduct that seriously annoyed Cumberland 911 call center employees," telephone misuse for "us[ing] telephone equipment for repeated calls, with [the] intent to annoy Cumberland 911 call center employees," and three counts of disturbing the peace for "willfully disturb[ing] the peace of another in a public

4

place" on three separate occasions. (*Id.* at 2–3.) Brent filed another personnel complaint against Cramer on July 10, accusing him of filing the charges against her in retaliation for her June 24 complaint. (ECF No. 54-7 at 2.) The charges against Brent were nolle prossed on April 1, 2022. (ECF No. 54-9.)

The Cumberland Police Department investigated Brent's June 24 and July 10 personnel complaints, resulting in an internal report written by Lieutenant James Burt. (ECF No. 54-13.) Burt admitted in the report that he is a friend of Van Gaus, whom he has known "for over 30 years." (*Id.* at 2.) Burt noted that both he and Jenkins have spoken with Brent at length about her complaints about her neighbors. (*Id.*) Burt spoke with both Cramer and Roberts about their interactions with Brent and told them to "stay above board when dealing with Brent." (*Id.* at 3.) Cramer told Burt that "he did not file charges against [Brent] in retaliation." (*Id.*) Burt concluded neither Cramer nor Roberts were "guilty of any misconduct that would lead to disciplinary action." (*Id.*)

In early October 2021, Brent and the Gauses got into a traffic altercation. (*See* ECF Nos. 54-20 at 10.) The Gauses say that Brent tried to hit their car, while Brent says that the Gauses failed to yield and almost ran into her.[3] (ECF Nos. 52-5 ¶¶ 9; 52-6 at 76:20–77:11.) During the incident, Brent called Van Gaus "a liar and a Nazi." (ECF No. 52-5 ¶ 9.) Gaus responded, "you are right," a comment that he claims was sarcastic, but which Brent characterizes as an admission. (ECF Nos. 52-5 at ¶¶ 9–10; 54 at 8.)

Brent filed this action on June 3, 2022 against Cramer, Roberts, and various other individual and institutional Defendants. (ECF No 1.) After the Court partially granted

---

[3] Brent was charged with reckless driving in connection with this incident; the charging officer is not a defendant in this case. (ECF No. 54-20.)

5

Defendants' Motion to Dismiss, Brent's sole remaining claim is her equal protection claim against Cramer and Roberts in their individual capacities. (ECF No. 34 at 27.) Her claim is that the Defendants intentionally discriminated against Brent because she is Black (a selective enforcement claim) and/or that Defendants intentionally discriminated against Brent because they are friends with her neighbors and biased against her (a class-of-one claim). (ECF No. 42 at 3.) The Parties engaged in discovery[4] and have now filed cross motions for summary judgment on the sole remaining claim (ECF Nos. 52, 54) and Brent has moved for leave to file a third amended

---

[4] As part of the discovery process, both Parties took depositions. The Court has reviewed deposition testimony from Cramer, Roberts, Jenkins, and Robison taken by Brent. Brent is pro se, and her questioning was imperfect, and at times even improper. The Court sympathizes with practitioners who must exhibit patience when working with pro se litigants, who are often unfamiliar with legal procedures. However, the Court is compelled to note that Jason Lee Levine, counsel for Defendants, engaged in markedly improper behavior while defending these depositions. Mr. Levin is an attorney and is therefore held to a higher standard and there is no excuse for his incivility, condescension, or lack of professionalism. Even if provoked, his behavior during these depositions has no place in the legal profession. The speaking objections he regularly made throughout the depositions are impermissible and appear to, in fact, have been intended to coach the witnesses. The Court would be remiss if it permitted such behavior to come to its attention without comment. (*See, e.g.*, Cramer Dep., ECF No. 52-3 at 43:3-44:6 ("Q: What are you supposed to do when you encounter someone that has a mental health issue? What are the steps? MR. LEVINE: Yeah, hold on. A couple of objections here. Number one, your hypothetical is -- is vague. In other words, when you say encounter somebody with a mental illness, there's not enough information in your hypothetical for anyone to answer. But there's no relevance anyway. So are you asking about a specific instance? Are you asking back to the cat and the spray comment? Are you talking about --"), at 53:3–8 (MR. LEVINE: All right. But, Officer Cramer, just so we're clear, her question is, is it possible you misunderstood me? That's all she's asking, right. Don't explain it. You can answer whether you believe it's possible or whether it's not possible or whether you know."), at 122:2–15 ("MS. BRENT: Let me just ask my question. MR. Levine, please allow me to proceed. MR. LEVINE: You're not asking questions. MS. BRENT: I'm asking Mr. Cramer did -- MR. LEVINE: You're not asking questions. Ask a question. MS. BRENT: I'm going to ask a question if you'll allow me to proceed. MR. LEVINE: I'm not going to sit here for three more hours while you -- while you -- MS. BRENT: You're wasting time, Mr. Levine. MR. LEVINE: No, I'm not wasting time because at some point we're just going to be done."); Roberts Dep., ECF No. 52-4 at 86:8–20 ("MS. BRENT: And a lot of things, you know, again, I'm kind of -- certainly it's an understatement to say somewhat of a disadvantage with respect to the law here, that's an understatement, but -- MR. LEVINE: Ms. Brent, nobody wishes you had a lawyer more than I do. Trust me. MS. BRENT: No. I -- I beg to differ, but I -- I do feel comfortable with the facts, though. I'd rather have, I'll put it this way, the facts that I have then -- then not -- MR. LEVINE: Got to get this done. Let's ask questions. What other questions do you have?"); Jenkins Dep. ECF No. 54-4 at 33:12–23 ("MS. BRENT: And Mr. Levine, I see you rolling your eyes, but that's not particularly the nicest thing. We are in a proceeding here, and – MR. LEVINE: I just –I just feel bad we're wasting Sergeant Jenkins' very valuable time and not asking him questions. MS BRENT: I find that offensive, Mr. Levine. MR. LEVINE: We're not asking him questions. MS. BRENT: And that's your interpretation, but –"); Robison Dep. ECF No. 54-18 at 26:15–22 ("MR. LEVINE: I'm actually trying to help you. You don't realize it. I'm trying to help you with the questioning. MS. BRENT: Well you – you're not – I'm not looking to you for help, but thank you very much. I mean I – MR. LEVINE: You need it very badly. Go ahead."); at 72:21–25 ("MR. LEVINE: Yeah, this is a waste of time . . . Finish your questions so we can get out of here.").

complaint (ECF No. 58), which would add Burt, Sergeant Jeremy Robison, and the City of Cumberland as defendants.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Pursuant to Rule 56, a party moving for summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing a summary judgment motion, the Court views all facts and draws all reasonable inferences in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). The burden is on the moving party to show that there is no genuine dispute over any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "A genuine issue of fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Orgain v. City of Salisbury*, 305 F. App'x 90, 97 (4th Cir. 2008). But the party who bears the burden of proof, here the Plaintiff, must factually support their claim; if a party completely fails to offer proof regarding an essential element, then summary judgment is appropriate. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 322–23 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

Neither "unsupported speculation" nor "evidence that is merely colorable or not significantly probative will suffice to defeat a motion for summary judgment." *Orgain*, 305 F. App'x at 97 (quotation omitted). A "mere scintilla" of evidence in the nonmovant's favor will likewise not suffice to defeat summary judgment. *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536

7

(4th Cir. 1997). Credibility determinations are not appropriate on summary judgment and remain the province of a jury. *See Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435–36 (4th Cir. 2001).

## B. Equal Protection

The Equal Protection Clause prohibits applying facially neutral laws in an intentionally discriminatory manner. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). To succeed on a race-based discrimination claim, a plaintiff must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quotation omitted). A plaintiff need not show that the challenged action was based *only* on racially discriminatory purposes. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). The plaintiff "need only establish that racial animus was one of several factors" that motivated the defendant. *Orgain*, 305 F. App'x at 98.

"Evidence of discriminatory intent is key." *El Ali v. Barr*, 473 F. Supp. 3d 479, 516 (D. Md. 2020). A plaintiff can show discriminatory intent by circumstantial evidence, as well as by direct evidence. *See id.* Such circumstantial evidence might include statements made revealing the defendant's attitude toward people of a particular race or evidence of the defendant's prior discriminatory practices. *Watson v. City of Aberdeen*, Civ. No. JKB-15-0307, 2016 WL 1625970, at *7 (D. Md. Apr. 25, 2016). Or it may include the use of racial epithets or comments showing a desire to target the plaintiff, regardless of the permissibility of the action. *See Eberhart v. Gettys*, 215 F. Supp. 2d 666, 676–778 (M.D.N.C. 2002). The mere fact that a plaintiff is Black and the defendants are white is insufficient. *See Leftridge v. Matthews*, Civ. No. ELH-11-3499, 2013 WL 5467724, at *24 (D. Md. Sept. 30, 2013).

8

A plaintiff can also bring an equal protection claim under a class-of-one theory "if it can be shown that the government's action constituted irrational and wholly arbitrary discrimination of the individual." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 82 (4th Cir. 2016) (quotation omitted). For a successful class-of-one claim, the plaintiff need not show racial animus specifically, but rather some other "ill will" motivating the action such that the plaintiff has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000). As this Court has already noted, charging or arresting someone based on personal animus is unconstitutional. (ECF No. 42 at 14–15 (citing *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009)).)

## III.   ANALYSIS

### A.   Cross Motions for Summary Judgment

#### 1.   Brent's Motion for Summary Judgment

Brent's motion for summary judgment will be denied. Drawing all inferences and making all credibility determinations in favor of the non-movants, here the Defendants, the material facts are in dispute and summary judgment in Brent's favor is not warranted. Under either theory of recovery, Brent bears the burden of showing that Cramer and Roberts selectively enforced the law against her for an impermissible reason: either because she is Black or because they are friends with her neighbors. To start, Brent has not provided any evidence that Roberts enforced the law against her at all; he has not filed charges against her. (*See* ECF No. 52-4 at 18:7–20.) While Cramer did file charges against Brent, he denies doing so because she is Black. (ECF No. 52-3 at 195:21–196:22.) He also denies being friends with her neighbors. (*Id.* at 37:16–38:21.) Assuming, for the purposes of Brent's Motion for Summary Judgment, that these statements are

9

credible, Cramer's motives for filing charges are in dispute and accordingly summary judgment in Brent's favor is inappropriate and her Motion will be denied.

### 2.      Defendants' Motion for Summary Judgment[5]

Considering Defendants' Motion for Summary Judgment, the Court will view the evidence in the light most favorable to Brent and draw inferences and credibility determination in her favor. As the movants, the Defendants must show there is no genuine dispute as to any material fact. *Adickes*, 398 U.S. at 153–58 (1970).  However, as the Plaintiff, the ultimate burden of proof rests with Brent and she must factually support her claim.  If she fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" then judgment as a matter of law is appropriate.  *See Celotex Corp.*, 477 U.S. at 323.  She must offer more than "unsupported speculation," "evidence that is merely colorable," *Orgain*, 305 F. App'x at 97, or a "mere scintilla," *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997).  Brent fails to show that Roberts took any action against her, and she fails to make a sufficient showing on Cramer's intent.  Because Brent fails to provide evidence to support these essential elements of her claims Defendants' Motion will be granted.

#### a)      *Defendant Roberts*

First, as mentioned above, Brent has failed to offer any proof that Roberts took any adverse action against her at all.  He denies ever filing charges against her (*see* ECF No. 52-4 at 18:7–20), and there is no evidence in the record contradicting this statement.  The extent of his involvement appears to be that Cramer included a police report written by Roberts in the charging document

---

[5] Brent appears to have filed three documents purporting to be "Plaintiff's Response to Defendants' Officers Cramer & Roberts' Consolidated Response in Opposition to Plaintiff's Motion for Summary Judgment, and Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment." (*See* ECF Nos. 63, 65, 67.) Given Brent is pro se, the Court will consider each filing, which appear to have only minor and non-substantive differences. The Court will also consider the exhibits appended to ECF No. 65.

filed by Cramer. (*See* ECF No. 55-1 at 23.) But there is no evidence that Roberts intended for that report to be included, encouraged Cramer to file charges, or actively participated in the filing of charges in any way. Roberts cannot be liable for selectively enforcing the law against Brent if he has not actually enforced the law against her. Even if Roberts had some impermissible internal motivation against Brent, if he did not act on it there is no selective enforcement or class-of-one claim because there was no action on Roberts' part. To bring a selective enforcement claim, the law must have been *applied* to Brent. Roberts has not applied any law to her, and, accordingly, is entitled to summary judgment. *See El Ali*, 473 F.Supp.3d at 516 ("Plaintiffs must allege facts that allow the plausible inference that such law or policy has been *applied* in an intentionally discriminatory manner.") (emphasis added).

Brent's arguments to the contrary are unavailing. She contends that Roberts was rude to her while being friendly to her white neighbors. (ECF No. 54 at 3–4.) Assuming this is true (and noting that such behavior likely falls short of best practices) rudeness is not enough for a constitutional violation and does not involve the application of any law. Similarly, Brent contends that Roberts violated her rights by crediting her neighbors' accounts of events and discrediting hers. (*Id.* at 19–20.) But she offers no evidence that Roberts believed one account of events over another; the fact that he did not file charges against her is strong evidence that he did not, in fact, believe her neighbors' accounts. In any case, even if Roberts in his own mind believes that Brent is a liar and her neighbors are not, that mere belief is insufficient to give rise to a constitutional violation unless the belief prompts action.[6]

---

[6] To be clear, the Court does not suggest that taking the word of a man who uses a racial slur over the word of a Black woman is acceptable policing practice, regardless of what actually transpired here. Police officers who ignore obvious racial bias from witnesses are allowing such racial bias to infect their policing. However, just because something falls short of best practices does not mean that it is unconstitutional. And, in any case, a violation of rights requires an actual violation, a tangible action affecting an actual person; mere thoughts and beliefs are not enough.

### b)   *Defendant Cramer*

Cramer, however, did file charges against Brent, and such an action can give rise to constitutional liability.   As explained above, Brent contends that Cramer's action was unconstitutional because it was taken pursuant to an impermissible motivation, either (1) racial animus or (2) friendship with Brent's neighbor-enemies.  If Brent has colorable evidence that rises to more than a mere scintilla showing that Cramer's actions were motivated by either of these impermissible impetuses, then her claim will survive summary judgment.  However, viewing the record before the Court in the light most favorable to Brent and drawing all inferences, and making all credibility determinations in her favor, she has failed to offer sufficient evidence regarding this essential element of her claim and, accordingly, summary judgment in favor of the Defendants is appropriate.  The Court will consider each possible impermissible motivation in turn.

### (1)   *Class of One*

Turning first to the class-of-one claim, Brent's theory is that Cramer discriminated against her because he is friends with Van Gaus.  (ECF No. 54 at 23.)  The class-of-one claim fails, however, because Brent has not put forward any evidence of such a friendship.  Brent's only evidence of this supposed friendship is that Cramer, on "several" occasions, engaged in a personal conversation with the Gauses.  (*Id.* at 9.)  Upon review of the Parties' submissions, however, the Court has only been able to identify two occasions during which Cramer engaged in a friendly conversation with any of Brent's neighbors: once on May 22, 2021 (*See* ECF No. 55-1 at 3; ECF No. 54-12 at 3) and once on June 20, 2021 (*See* ECF No. 52-7 at 5).[7]  On both occasions, Cramer had been called to the street as part of his work; there is no evidence that he sought out the Gauses

---

[7] In her briefing, Brent also states that she saw Cramer speaking with the Gauses on three total occasions. (ECF No. 55-1 at 25.) However, she offers no evidence of this third conversation, nor any information on when it occurred, why Cramer was on Yale Street at the time, or what was discussed. In any case, a third conversation is not enough to change the analysis here.

or went to the street to socialize with them. Beyond the fact that Cramer went to high school with the Gauses' son, Brent has put forward no evidence of any relationship between Cramer and the Gauses; no dinners, no socializing, no phone calls, no social media interaction, nothing to contradict Cramer's assertions that he is not friends with the Gauses. (*See* ECF No. 52-3 at 37:16–38:9 ("I played soccer all four years in high school. His son Dalton had played soccer on the varsity team when I was on the junior varsity team for one year. That was the extent of our relationship. Other than that, he was in the same school of hundreds of kids with me.").) The most she offers is speculation. (*See* ECF No. 55-1 at 26 ("It is entirely possible that the defendants speak with both Dalton and Van Gaus by phone weekly. They may also communicate regularly via the internet.").) This leaves Cramer's stark denial of any friendship with the Gauses unrebutted.

Brent has put before the Court evidence that Cramer's supervisor, Burt, is friends with Van Gaus. (ECF No. 54-13 at 3.) Burt, however, did not file charges against Brent, is not a defendant here, and Brent has not provided any evidence connecting Burt's relationship with Gaus to Cramer's actions. There is no indication in the record that Burt directed Cramer to charge Brent or that Burt even knew that Cramer was planning to file charges against Brent. Nor is there any indication that Cramer knew that Burt was friends with Gaus. The potential for bias stemming from Burt's relationship with Gaus may exist, but there is no evidence connecting that bias to Cramer's filing of charges against Brent. Brent's argument that Burt influenced Cramer's decision to file charges is mere speculation. (*See* ECF No. 63 at 13–14.) And such unsupported speculation is insufficient to defeat summary judgment. *See Orgain*, 305 F. App'x at 97. Cramer's alleged friendship to Brent's neighbors is the "irrational and wholly arbitrary" reason put forward by Brent

13

in support of her class-of-one claim.[8]  (ECF No. 55-1 at 23 (quoting *Kerr*, 824 F.3d at 82).)  She has failed to offer any evidence to support this theory.  Accordingly, Cramer is entitled to summary judgment on Brent's class-of-one claim.

### *(2)    Racial Discrimination*

Turning to Brent's racial discrimination claim, Brent contends that Cramer discriminated against her by selectively enforcing the harassment and disturbing-the-peace laws when he filed charges against her, but not her white neighbors, in the wake of the June 20, 2021 incident.  (*See* ECF No. 54 at 18–19.)  To successfully defeat summary judgment, Brent must offer some proof that she "has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney* , 293 F.3d at 730.

First the Court will consider whether Brent is similarly situated with others but treated differently.  The relevant comparators are her white neighbors.  Put simply, Cramer charged Brent with misusing the 911 system and disturbing the peace. (*See* ECF No. 54-6.)  The gravamen of the allegations is that Brent frequently called 911 over non-emergencies and that she used her car alarm and/or car horn to annoy her neighbors late at night.  (*Id.*)

*Orgain v. City of Salisbury* is instructive.  305 F. App'x 90.  The Orgains owned a night club, Andromeda, in Salisbury that held themed nights throughout the week, including a hip-hop night that attracted a mostly Black clientele.  *Id.* at 92.  Over the course of approximately a year, the club "became a trouble spot for the Salisbury Police Department (the SPD)" because the SPD

---

[8] Brent also suggests that Cramer filed charges against her in retaliation for the misconduct complaint she filed against him.  (*See* ECF No. 54 at 6–7.)  However, as she notes, Cramer filed the charges "less than 24 hours" after Brent filed her misconduct complaint.  (*Id.*)  Given the length of the charging document, and the lack of any evidence to the contrary, it seems clear that Cramer began preparing the charges *before* Brent filed the misconduct complaint. (*See* ECF No. 54-6.)  As explained above, Cramer says that he started drafting the charging document before Brent filed the misconduct complaint.  (*See* ECF No. 54-13 at 2.)  Brent has offered no evidence rebutting that assertion.

14

received a high volume of calls for service regarding incidents at or near Andromeda. *Id.* While the Orgains took steps to mitigate the issue, they were not successful and the Liquor Board eventually suspended their liquor license for thirty-five days, leading the Orgains to surrender the license and close the club. *Id.* at 93–96. The Orgains brought an equal protection claim contending that the City and County treated Andromeda "less favorably than other similarly situated night clubs" "because it hosted nights with a hip-hop music format that attracted a predominantly [B]lack clientele." *Id.* at 91, 97. The Orgains pointed to two comparators: Brew River, a club attracting predominantly white customers, and Andromeda on non-hip-hop nights. *Id.* at 98.

The Fourth Circuit held that Orgain "failed to proffer sufficient evidence for a reasonable jury to find that Andromeda, on hip-hop nights, was similarly situated to Andromeda on non-hip-hop nights or Brew River on any night of the week." *Id.* 99–100. This is because, during the relevant period, (1) Brew River employees never called SPD to disperse unruly crowds at closing but Andromeda employees did on hip-hop nights, (2) 88% of the calls for service at Andromeda occurred on hip-hop nights, (3) the violent-crime calls to Brew River were of a "far less serious nature" than those to Andromeda on hip-hop night (Andromeda had multiple shooting incidents while Brew River had none). *Id.* at 100. The Fourth Circuit concluded that a reasonable jury could only find that the difference in treatment of Andromeda on hip-hop nights vis a vis the suggested comparators stemmed from the "quantity" and "the more serious nature of Andromeda's record of violent crimes on hip-hop nights." *Id.* at 101.

The record before the Court reflects a similar disparity. From March 2019 to June 2021 (when Cramer filed charges against Brent) the record (viewed in the light most favorable to Brent and omitting calls she disputes) reflects that Brent called the police 24 times. (ECF No. 52-7 at 7–9 (6/25/2021 three calls, 6/21/2021 one call, 6/20/2021 three calls, 5/23/2021 one call, 5/2/2021

15

one call, 4/18/2021 one call, 2/23/2020 one call,  6/29/2019 one call); ECF No. 54-12 (5/22/2021 one call); ECF No. 52-10 (5/11/2021 one call, 4/11/2021 one call, 2/11/2021 one call); ECF No. 56-18 (3/6/2021 one call); ECF No. 56-16 (2/5/2021 one call); ECF No. 54-2 (10/18/2020 one call); ECF No. 56-13 (9/1/2020 one call); ECF 56-14 (9/1/2020 one call); ECF 52-10 (7/2/2020 one call); ECF No. 56-12 (5/28/2020 one call); ECF No. 56-11 (11/18/2020 four calls).)  By contrast, her neighbors collectively called 8 times during the same period.  (ECF No. 52-8 (6/20/2021 one call from Cooper, one call from Parks); ECF No. 52-7 (5/2/2021 one call, 8/7/2020 one call, 6/6/2020 one call, 3/29/2019 one call); ECF No 54-20 at 15 (4/2/2021 one call); ECF No. 52-10 (3/26/2019 one call).)

Brent, rightly, points out that the issue is not simply who called the police more often, but whether Brent and her neighbors called over *non-emergencies* at similar rates.  Viewing the evidence in the light most favorable to Brent, of Brent's 24 undisputed calls, only 8 were for possible emergencies, meaning 16 were for non-emergencies. (*See* ECF No. 56-11 (call regarding smell of smoke); ECF No. 52-7 at 9 (call regarding smoke, call regarding Brent being sprayed with inhalants); ECF No. 56-12 (call regarding airborne irritants); ECF No. 56-14 (call about neighbor using slur and threatening her); ECF No. 56-16 (call about fire); ECF No. 56-18 (call about smoke); ECF No. 54-19 (call regarding being threatened with a lawn mower).)  Of her neighbors' collective 8 calls, only one was for an emergency. (ECF No. 52-7 at 8 (call about Brent almost hitting caller's car).)  Brent has called the police nearly three times more than all her neighbors combined.  And, while Brent and the neighbors have all called over non-emergencies, Brent has called over non-emergencies much more frequently than all of her neighbors combined.  Given the stark disparity between the quantity of Brent's non-emergency calls and her white neighbors' non-emergency calls, Brent has failed to present evidence based upon which a reasonable jury could conclude that

16

she is similarly situated to her white neighbors with regard to their misuse of the 911 system.

However, with regard to disturbing the peace, the record reflects that, during the same period of time, Brent complained to the police of her neighbors disturbing her peace on four occasions. (ECF No. 52-10 (Brent tells an officer that her neighbors play music to bother her on 4/22/2021); ECF No. 52-10 (Brent tells an officer that her neighbors play loud music on 5/11/2021); ECF No. 54-2 (Brent tells an officer Parks was playing loud music and screaming on 10/18/2020); ECF No. 54-2 (Brent tells an officer Parks was yelling at animals and using profanity on 7/2/2020).)[9] Likewise, the neighbors complained about Brent disturbing their peace on four occasions over the same period. (ECF No. 54-3 (Jennifer Cooper says Brent was using her car horn to disturb neighbors on 6/20/2021); ECF No. 52-7 at 4 (Parks reports Brent using her car alarm whenever he leaves his house on 6/20/2021); ECF No. 52-7 at 8 (a neighbor reports Brent setting off car alarm whenever he leaves his house on 8/7/2020); ECF No. 52-7 at 9 (neighbor called about Brent setting off car alarm throughout the night on 6/6/2020).) Based on this record, a reasonable jury could conclude that Brent is similarly situated to, at minimum, Parks vis a vis disturbing the peace.

But the inquiry does not end there. To defeat summary judgment, Brent bears the burden of putting forward some evidence of *intentional* discrimination on Cramer's part when he charged her with disturbing the peace. *See Orgain*, 305 F. App'x at 98. Because Brent has failed to put

---

[9] Brent filed charges against Parks for disturbing the peace on January 4, 2022. (ECF No. 54-8 at 2.) In the application for charges, she details years of harassment from Parks, who, by Brent's account, regularly plays loud music and sings aggressively when Brent attempts to spend time in her yard. (*See generally id.*) The Court has no reason not to believe Brent's account of Parks' behavior; nothing in the record contradicts it. However, Brent offers no indication that Cramer, or any other Cumberland police officer, knew about most of these incidents. Based on the record before the Court, Brent only reported Parks for noise related disturbances on the occasions listed above. Because the question is whether Cramer intentionally discriminated against Brent, the question of whether she is similarly situation vis a vis her neighbors must be assessed from Cramer's perspective. To put it another way, the question is whether Cramer knew or had reason to know whether Brent and her neighbors were similarly situated. Where there is no evidence that Cramer knew or could have known about an instance of Parks disturbing Brent's peace, he cannot be expected to take such an event into account when making a charging decision.

forward any significant evidence that Cramer's charging decision was the result of intentional discrimination against Brent because she is Black, summary judgment is appropriate.

Brent argues that evidence of Cramer's intentional discrimination against her includes: Cramer accepting the accounts of known or admitted racists (ECF No. 54 at 3, 12), Cramer being rude toward Brent but friendly with her white neighbors (*id.* at 3–4), Cramer being a fan of the band Slipknot (ECF No. 55-1 at 5–6), Cramer being friends with Van Gaus, a "self-acknowledged Nazi" (ECF No. 54 at 5), the implausibility of Cramer's purported justification for charging her with disturbing the peace (ECF No. 54 at 7), and Cramer declining to view Brent's video of Parks disturbing Brent's peace (ECF No. 55-1 at 27).

As discussed above, Brent has offered no evidence of any friendship between Cramer and Gaus (or any of Brent's other neighbors) so even if Gaus is a Nazi (which he denies), that is not evidence that *Cramer* is a racist when they have no meaningful relationship. Similarly, even assuming Cramer is a fan of Slipknot (which he denies), Brent has not offered any evidence that liking Slipknot is evidence of racial bias. Indeed, the article Brent appended about Slipknot refutes her argument on this point. (*See* ECF No. 65-11 ("'Slipknot has dedicated itself to bringing people together, to fighting racism, to fighting hate in general since the day we were started,' singer says.").) As to Cramer accepting neighbors' accounts but not Brent's, Brent has not explained when or how this happened except that both her accounts and her neighbors' accounts of events have been included in police reports. As Cramer explained during his deposition, including a statement in a police report does not mean that the officer agrees with the statement or assumes it is true, and Brent has not offered evidence contradicting this explanation. (*See* ECF No. 52-3 at 31:4–33:23.) Similarly, while Brent contends that Cramer declined to view her video evidence of Parks, she does not offer any evidence that Cramer did view evidence offered by her white

18

neighbors.

Cramer's rudeness to Brent when juxtaposed to his friendliness to her white neighbors could be evidence of racial bias. However, Brent offers no evidence beyond her own description in her briefing of the events. She has not submitted any sworn testimony from herself or others describing the encounter. *See Rountree v. Fairfax Cnty Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact."). Nor has she offered any video of the event, despite indications that such footage exists.

Similarly, if Cramer's explanation of why he charged Brent and not her white neighbors were implausible, that could raise an inference that Cramer was being dishonest about his motivation. Cramer contends that he charged Brent with disturbing the peace because he witnessed it happening (that he heard Brent making her car beep) and he did not charge others for disturbing Brent's peace because he did not witness it personally. (*See* ECF No. 52-3 at 102:17–106:9.) Brent admits that she caused her car to beep at least twice the night of June 20, 2021. (ECF No. 52-6 at 74:1–19.) And she offers no evidence tending to refute Cramer's assertion that he heard it happening, except that, years later, he was unable to recall the color of her car. (*See* ECF No. 54-3 at 106:14–20.)

There is much conspicuously absent from the record. Brent has put forward no evidence of other complaints about Cramer from Black people in Cumberland or elsewhere. Nor has she offered any statistics suggesting that Cramer disproportionately files charges against Black people. Nothing in the record indicates that Cramer affiliates with any racially discriminatory organizations or has ever made a statement that could be construed as derogatory about Black

19

people. Brent need not prove her claim using any particular form of evidence; these are merely examples. But she does need to offer *some* evidence that Cramer was motivated by racial animus when he filed charges against her.

Considering the entire record, the only evidence supporting Brent's assertion that Cramer was motivated by racial animus is Brent's assertion that he was, on one occasion, rude to her and friendly to her white neighbors. All of her other arguments amount to mere speculation or are clearly refuted by testimony or police reports. The Court is left with an uncorroborated, unsworn, assertion of rudeness. While the Court considers the evidence in the light most favorable to Brent, she must offer some evidence to support her assertions, and that evidence must be more than a "mere scintilla." *Detrick*, 108 F.3d at 536. Because she has failed to materially support an essential element of her claim, that Cramer intentionally discriminated against her based on race, summary judgment is appropriate.

Racial discrimination, like all forms of invidious discrimination, is abhorrent. It is particularly so when it motivates those wielding the punitive power of the state. Police actions motivated by racial discrimination are, unquestionably, unconstitutional. But all that is before this Court today is the narrow question of whether Brent has carried her burden and put forth enough evidence of racial discrimination by Cramer. She has not, and so summary judgment will be awarded in favor of the Defendants and this case will be closed.[10]

**B.   Motion for Leave to File an Amended Complaint**

Brent's Motion for Leave to File an Amended Complaint will be denied. A plaintiff may amend a pleading "once as a matter of course" within twenty-one days of filing or within twenty-

---

[10] Defendants also contended they are entitled to qualified immunity. Because the court will grant summary judgment in their favor, it need not consider this issue. The Court notes, however, that it is clearly established that charging someone with a crime is unconstitutional if motivated by racial animus. *See generally Yick Wo*, 118 U.S. 356. No reasonable officer would think otherwise.

one days of receipt of a responsive pleading or motion under Rule 12(b), (e), or (f). Fed. R. Civ. P. 15(a)(1). Those time limits have long expired in this case. Thereafter, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

Here, the Defendants would be seriously prejudiced if Brent were permitted to file an amended complaint. Discovery closed on March 28, 2024, the Parties have already taken depositions, produced documents, and so forth. The Defendants have taken the time to compose and file a Motion for Summary Judgment and to oppose Brent's Motion for Summary Judgment. To permit Brent to amend, at this stage, would essentially begin this case again at step one, requiring the existing Defendants (and Brent's proposed additional defendants) to litigate it from scratch. This would be highly prejudicial. *See Shreve v. Sears, Roebuck & Co.*, 166 F.Supp.2d 378, 423 (2001) ("Moreover, there is no question that defendants will be prejudiced by the proposed amendment; they will be required to undertake a renewed and broad scope of additional discovery to meet [a new claim.]").

Further, Brent's justification for an amended complaint is not sound. She contends that her discovery of the Cumberland Police Department Policies and Procedures Manual provides new information justifying amendment. (*See* ECF No. 58 at 1–2.) Brent does not say when she found this document or explain how the timing of the discovery could justify her lengthy delay in requesting leave to amend. From the record, however, it is clear that Brent has had access to this document for a long time. In May, Brent contended that she was prejudiced by belatedly receiving

this Manual in discovery.  (ECFF No. 59 at 1.)  But the Defendants responded to that contention and provided the Court with evidence that, on March 4, 2024, they told Brent the Manual was available on the Police Department website.  (*See* ECF No. 62-2 at 1.)  The Court confirmed that the Manual was publicly available[11] in May (ECF No. 64), has confirmed that the Manual remains available, and has no reason to suspect it has not always been publicly available.

## IV.   CONCLUSION

For the reasons stated above, Brent's Motions for Leave to File an Amended Complaint and for Summary Judgment will be denied and Defendants' Motion for Summary Judgment will be granted.  The case will be closed.  A separate order will issue.

DATED this ___20___ day of August, 2024.

BY THE COURT:

James K. Bredar
United States District Judge

---

[11] https://www.ci.cumberland.md.us/1782/2024-Policy-and-Procedures.